**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JANE ROE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 2:23-cv-04129-BCW |
| ) | |
| TREVOR FOLEY, in his official capacity as Director of ) | |
| the Missouri Department of Corrections ("MODOC"); ) | |
| DORIS FALKENRATH, in her official capacity as ) | **JURY TRIAL DEMANDED** |
| Warden of Jefferson City Correctional Center ("JCCC"); ) | |
| JAY CASSADY, in his individual capacity, BILLY ) | |
| DUNBAR, in his individual capacity; ALAN EARLS, in ) | |
| his individual capacity; SCOTT KINTNER, in his ) | |
| individual capacity; JUSTIN KRANTZ, in his individual ) | |
| capacity; NOEL OBI, in his individual capacity, JASON ) | |
| HESS, in his individual capacity; STANLEY KEELY, in ) | |
| his individual capacity; ELIZABETH THORNTON, in ) | |
| her individual capacity; MICHAEL CAHALIN, in his ) | |
| individual capacity; DWAYNE KEMPKER, in his ) | |
| individual capacity; JASON LEWIS in his individual ) | |
| capacity; and JOHN DOE, in his individual capacity; ) | |
| ) | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff JANE ROE ("Plaintiff" or "Ms. Roe"),[1] by her undersigned attorneys, respectfully

files this Complaint against Defendants Trevor Foley, Doris Falkenrath, Jay Cassady, Billy

Dunbar, Alan Earls, Scott Kintner, Justin Krantz, Noel Obi, Jason Hess, Stanley Keely, Elizabeth

Thornton, Michael Cahalin, Dwayne Kempker, Jason Lewis, and John Doe (collectively,

"Defendants"), and hereby alleges, on the basis of her personal knowledge and on information and

belief, as follows:

---

[1] With the Court's permission, Plaintiff is proceedin77g pseudonymously due to privacy concerns. *See* Doc. 12.

## I.     INTRODUCTION

1.     This lawsuit is about the Missouri Department of Corrections ("MODOC") using torturous solitary confinement for prolonged periods of time against Plaintiff Jane Roe without the availability of meaningful review and MODOC's discriminatory treatment of people living with HIV and the damages it caused her in violation of her constitutional and statutory rights.

2.     Ms. Roe is a Black transgender woman.

3.     Black transgender women are incarcerated at a rate nearly ten times that of the general American population. According to *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* (2011), nearly 50% of Black transgender people who took the survey had been incarcerated.

4.     Ms. Roe is living with HIV. HIV is a chronic medical condition and an "impairment that substantially limits [a] major life activit[y]," 42 U.S.C. 12102(1)(A), specifically, "the operation of a major bodily function, . . . the immune system." 42 U.S.C. 12102(2)(B).

5.     In 2015, Jefferson City Correctional Center ordered Ms. Roe be placed in solitary confinement after she was violently assaulted by her cellmate.

6.     Defendants held Ms. Roe in solitary confinement for the next six years without any meaningful review of the classification and placement and despite the substantial risk of serious harm that she faced, and despite the ongoing and documented damage to her physical and mental health.

7.     Involuntary solitary confinement is the practice of punishing incarcerated people by removing them from general population and subjecting them to harsh isolation and severe deprivation. This practice is referred to by other names, including administrative segregation (or "ad-seg"), single-cell mandate, and disciplinary segregation. Regardless of how it is identified, the strict conditions often amount to torture and cause serious harm to incarcerated persons.

2

8.     The severe physical and psychological harms associated with solitary confinement are well-researched and documented. Solitary confinement greatly increases the risk of self-harm, and prolonged solitary confinement is associated with anxiety, panic paranoia, hallucinations, and suicidal ideation, in addition to physical harms including headaches, heart palpitations, digestive problems, cognitive dysfunction, injuries to oneself, and death by suicide.

9.     Studies have shown that solitary confinement can rapidly change the brain of an isolated incarcerated person, causing devastating, permanent and traumatic damage. Exposure to solitary confinement can cause a portion of the human brain to physically shrink in size.

10.     The risk of substantial harm that incarcerated people in solitary confinement are subjected to is recognized in courts across the country. In the words of Justice Kennedy, "years on end of near-total isolation exacts a terrible price." *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring). Justice Sotomayor has described solitary confinement as "perilously close to a penal tomb." *Apodaca v. Raemisch*, 202 L. Ed. 2d 251, 139 S. Ct. 5, 10 (2018).

11.      The horrors Ms. Roe experienced throughout her prolonged time in solitary confinement at MODOC caused her to experience depression, hopelessness, severe anxiety, and feeling as if she were going insane and reaching a mental breaking point. The prolonged period of time of over six years and the extreme conditions of confinement drove her to physically self-harm including attempts to take her own life.

12.     The United Nations Special Rapporteur on Torture, an independent expert mandated by the United Nations Commission on Human Rights to monitor torture, has determined that any solitary confinement lasting beyond 15 days constitutes torture or cruel, inhumane, and or degrading treatment in violation of international human rights law.

13.     Indeed, there is widespread national and international consensus among physicians,

mental health researchers, and human rights authorities that extreme isolation, like the kind experienced by Ms. Roe, should be abolished because of its devastating impacts on those forced to endure it.

14. There is further consensus that if solitary confinement is used, it should be used only under exceptional conditions and for the shortest time possible. *See* American Declaration of Human Rights, Istanbul Protocol, European Committee for the Prevention of Torture; Inter-American Court in *Castillo-Petruzzi et al. v. Peru*, Preliminary Objections, Judgement, Inter-Am. Ct. H.R. (Ser. C) No. 42, (Sept. 4, 1998).

15. Involuntary solitary confinement is unequivocally *punishment*.

16. Historically it was used as a heightened form of punishment, and it inflicts substantial suffering beyond what is normally imposed by a prison sentence.

17. Long-term solitary confinement is unusual in that until very recently, it was largely abandoned as a practice because its effects were deemed too harsh and because it violates a "national consensus" and contemporary values.

18. Long-term solitary confinement is also cruel for all its well-recognized associated physical and psychological harms.

19. Ms. Roe seeks declaratory relief, injunctive relief and compensatory damages due to Defendants' policies, practices, and procedures that violated her right to due process and deprived her of liberty without meaningful review—for a continuous period of over six years. Defendants' policies, practices, and procedures are facially discriminatory against people living with HIV and violate Ms. Roe's well-established constitutional and statutory rights.

20. Ms. Roe brings this action to seek redress for the egregious abuse that Defendants inflicted upon her, which constitutes: (1) cruel and unusual punishment under the Eighth

Amendment to the United States Constitution; (2) deprivation of her Due Process Rights under the Fourteenth Amendment; (3) violations of the Equal Protection Clause of the Fourteenth Amendment; (4) discrimination on the basis of disability under the Americans with Disabilities Act as amended, 42 U.S.C. § 12101 et seq.; and (5) discrimination on the basis of disability under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

21.     As a direct result of Defendants' acts and omissions, Ms. Roe has suffered physical damages, mental damages, emotional distress, humiliation, embarrassment, and other dignitary harms that continue to this day as set forth below.

22.     This lawsuit seeks to hold Defendants accountable for the injuries and harms that they inflicted on Ms. Roe by holding her in solitary confinement for over six years, and for doing so on the basis of her being a person who is living with HIV.

## II.     JURISDICTION AND VENUE

23.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act.

24.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202 and FED. R. CIV. P. 57, 65.

25.     Venue is proper in the Western District of Missouri pursuant to 28 U.S.C. § 1391(b)(1) because the events giving rise to the claims occurred in this judicial district, all Defendants were acting under color of state law during all relevant times, and on information or belief, all Defendants were employed or conducted business in this district.

## III.  PARTIES

26.  PLAINTIFF JANE ROE is a Black transgender woman who is living with HIV. She, therefore, is living with a disability as defined under the ADA and the Rehabilitation Act. At all times relevant to this lawsuit, Ms. Roe was in the custody of the Missouri Department of Corrections ("MODOC") and detained at the Jefferson City Correctional Center ("JCCC"). Ms. Roe is a resident of the State of Missouri. In 2022, Ms. Roe was released on parole.

27.  DEFENDANT TREVOR FOLEY has been acting Director of MODOC since December 2023 when the prior director, Anne Precythe, retired. At times relevant to this action, he was responsible for administering and overseeing the operations of MODOC, including its policies and procedures, practices, employees, contractors, and agents. On information and belief, Defendant Foley has ultimate responsibility and maintains administrative and supervisory authority within MODOC for overseeing the day-to-day operation of state prison facilities, including the JCCC. He is responsible for ensuring the health and safety of incarcerated people in MODOC through the implementation of policies and the training and supervision of MODOC staff. Defendant Foley has implemented, condoned, and ratified the customs and practices within MODOC related to solitary confinement. Further, Defendant Foley has failed to train and supervise MODOC employees and agents with respect to classification assignments to solitary confinement despite knowing: (1) that prolonged use of solitary confinement can cause irreparable harm, (2) that failing to train and supervise staff with respect to the harms of solitary confinement policies places incarcerated people like Ms. Roe at severe risk of harm, and (3) that  policy IS21-1.2 is discriminatory against people living with HIV.[2]

28.  DEFENDANT DORIS FALKENRATH is warden of JCCC. As warden, she

---

[2] Mr. Foley was substituted in as a party to this case upon a motion by the defendants. *See* Doc. 36, 38.

promulgates rules, regulations, policies, and procedures and is responsible for supervising all staff and managing all operations at JCCC, including policies and procedures related to solitary confinement. She also has ultimate responsibility over the care and custody of people incarcerated at JCCC. At all times relevant to this action Defendant Falkenrath was acting under color of law and within the scope of her employment. Defendant Falkenrath is sued in her official capacity.

29.     DEFENDANT JAY CASSADY was warden of the JCCC when Ms. Roe was initially placed in solitary confinement. As warden, he had ultimate responsibility over the care and custody of people incarcerated at JCCC and recommended or approved Ms. Doe's initial placement into solitary and continued classification until he left his position. At all times relevant to this action Defendant Cassady was acting under color of law and within the scope of his employment. Defendant Cassady is sued in his individual capacity.

30.     DEFENDANT BILLY DUNBAR was assistant warden of JCCC at the time that Ms. Roe was detained in solitary confinement. As assistant warden, Defendant Dunbar had supervisory authority over correctional staff at JCCC and was responsible for the care and custody of living conditions of people incarcerated at JCCC. Ms. Roe regularly communicated the fact that she was in psychological distress to Defendant Dunbar during his rounds. He ignored her complaints and did nothing to address the torturous conditions in which she was confined. At all times relevant to this action, Defendant Dunbar was acting under color of law and within the scope of his employment. Defendant Dunbar is sued in his individual capacity.

31.     DEFENDANT STANLEY KEELY is the Corrections Administrator Level 2 and deputy warden of JCCC. He was a Corrections Manager at the time Ms. Roe was detained in solitary confinement. He was also a member of and chair of the MODOC Classification Committee that reviewed Ms. Roe's placement in solitary confinement and repeatedly made personal

determinations that she remain in long-term isolation. At all times relevant to this action, Defendant Keely was acting under color of law and within the scope of his employment. Defendant Keely is sued in his individual capacity.

32. DEFENDANT ALAN EARLS is a MODOC Deputy Director of Adult Institutions who worked with Ms. Roe when she was detained in solitary confinement. Defendant Earls was personally involved in the decision, and had the authority, to place Roe in solitary confinement leading to her over six years of segregation. At all times relevant to this action, Defendant Earls was acting under color of law and within the scope of his employment. Defendant Earls is sued in his individual capacity.

33. DEFENDANT SCOTT KINTNER was a Correctional Program Supervisor and a MODOC caseworker who worked with Ms. Roe while she was in solitary confinement. Defendant Kintner was responsible for the care and custody of the living conditions of people incarcerated at JCCC. He was personally aware of the harm Roe was incurring from solitary confinement and had actual knowledge that she needed care and relief that she was not receiving. At all times relevant to this action, Defendant Kintner was acting under color of law and within the scope of his employment. He is sued in his individual capacity.

34. DEFENDANT JUSTIN KRANTZ is a Probation and Parole Supervisor. He was a Correctional Program Supervisor and a member of and chair of the MODOC Classification Committee that reviewed Ms. Roe's placement in solitary confinement and repeatedly made personal determinations that she remain in long-term isolation. At all times relevant to this action, Defendant Krantz was acting under color of law and within the scope of his employment. He is sued in his individual capacity.

35. DEFENDANT NOEL OBI is a Correctional Program Supervisor. He was a

Correctional Program Specialist and a member of and chair of the MODOC Classification Committee that reviewed Ms. Roe's placement in solitary confinement and repeatedly made personal determinations that she remain in long-term isolation. At all times relevant to this action, Defendant Obi was acting under color of law and within the scope of his employment. He is sued in his individual capacity.

36.     DEFENDANT JASON HESS is a Correctional Lieutenant. He was a Corrections Officer and a member of the MODOC Classification Committee that reviewed Ms. Roe's placement in solitary confinement and repeatedly made personal determinations that she remain in long-term isolation. At all times relevant to this action, Defendant Hess was acting under color of law and within the scope of his employment. He is sued in his individual capacity.

37.     DEFENDANT ELIZABETH THORNTON was a member of the MODOC Classification Committee that reviewed Ms. Roe's placement in solitary confinement and repeatedly made personal determinations that she remain in long-term isolation. At all times relevant to this action, Defendant Thornton was acting under color of law and within the scope of her employment. She is sued in her individual capacity.

38.     DEFENDANT MICHAEL CAHALIN is a Correctional Captain. He was a Correctional Lieutenant and Correctional Officer and was a member of the MODOC Classification Committee that reviewed Ms. Roe's placement in solitary confinement and repeatedly made personal determinations that she remain in long-term isolation. At all times relevant to this action, Defendant Cahalin was acting under color of law and within the scope of his employment. He is sued in his individual capacity.

39.     DEFENDANT DWAYNE KEMPKER was, upon information and belief, Deputy Division Director within the Division of Adult Institutions during some or all of the relevant time

period. In that capacity, he approved Ms. Roe's placement on single-cell mandate. At all times relevant to this action, Defendant Kempker was acting under color of law and within the scope of his employment. He is sued in his individual capacity.

40. DEFENDANT JASON LEWIS was Deputy Division Director of Zone II within the Division of Adult Institutions during some or all of the relevant time period. In that capacity, he had the authority to remove Ms. Roe from the single-cell mandate. He did not do so until on or about July 14, 2021. At all times relevant to this action, Defendant Lewis was acting under color of law and within the scope of his employment. He is sued in his individual capacity.

41. DEFENDANT JOHN DOE was a Deputy Division Director of Zone II within the Division of Adult Institutions during some or all of the relevant time period. In that capacity, they had the authority to remove Ms. Roe from the single-cell mandate, but did not do so. At all times relevant to this action, Defendant Doe was acting under color of law and within the scope of their employment. They are sued in their individual capacity.

42. MODOC receives federal financial assistance through multiple avenues, including the Medicaid program, which is jointly funded by the federal government and the state.

## IV. FACTS

43. Ms. Roe is a Black transgender woman.

44. Although her sex assigned at birth was male, her gender identity is female.

45. In or about 2008, Ms. Roe was diagnosed with HIV. Because she is living with HIV, Ms. Roe is limited in one or more major life activities.

46. HIV is a physical impairment that, without ameliorative measures in place, substantially limits one or more major life activities, including but not limited to functioning of the immune system.

47. As an adolescent, Plaintiff Jane Roe ran away from a police officer who was

attempting to execute a warrant on her for misdemeanor stealing. The officer chased Ms. Roe and there was a short struggle in which she bit the officer as he was attempting to pull her to the floor. Ms. Doe was on antiretroviral therapy to control her HIV which would have made transmission unlikely, but nevertheless was convicted of assault and risking infection of HIV.

48. Ms. Roe had been in MODOC's custody or supervision since 2012, when she was released on probation. In March 2014, she was returned to MODOC from probation and remained incarcerated until 2022 when she was released on parole.

49. At all times while incarcerated in MODOC, Ms. Roe received treatment and antiretroviral medication for her HIV from Defendants and her HIV was virally suppressed.

50. In or about April 2015, Ms. Roe was brutally assaulted by her cellmate who attempted to sexually assault her.

51. As punishment for experiencing a sexual assault and because of her HIV status, Ms. Roe was deemed an "immediate or long-term danger to other defenders" and was placed in solitary confinement. She remained in solitary confinement for over six years.

52. At the time of the assault, Ms. Roe's HIV status was generally known by prison staff and other incarcerated people. Prison staff, including Defendant Kintner, and other incarcerated people harassed Ms. Roe on account of her HIV status.

53. After she was assaulted, Defendants' records state that Ms. Roe was placed in administrative segregation because of her HIV status and her involvement in a "PREA event."

54. The Prison Rape Elimination Act ("PREA") event was her cellmate's sexual assault on Ms. Roe.

55. Defendants Jay Cassady, Stanley Keely, and Alan Earls arbitrarily elected to punish Ms. Roe, the victim of the assault, ordering that she be classified based on her HIV status

under MODOC's "Mandated Single Cell Assignment" policy as an "immediate and long-term danger to other offenders" who could be placed in the same cell with her, and recommended Ms. Roe be placed in administrative segregation on single-cell mandate. Defendant Dwayne Kempker approved placing Ms. Roe on single-cell mandate for the remainder of her sentence.

56.     Defendants Jay Cassady, Stanley Keely, Alan Earls, Dwayne Kempker, and Defendant Doe did not conduct an individualized assessment of Ms. Roe and failed to consider that Ms. Roe's HIV was virally suppressed, and she therefore was incapable of transmission of HIV. Additionally, Defendants did not explain or otherwise justify their determination that Ms. Roe was capable of transmission of HIV despite having ready access to her medical records to support their determination.

57.     Furthermore, Defendants failed to provide Ms. Roe the opportunity to present evidence on the risk of HIV transmission or any other meaningful measures that are the hallmarks of due process including a hearing, opportunity to present witnesses, or assessment by professionals who are knowledgeable about HIV transmission.

58.     Defendants' arbitrary punishment and order for solitary confinement were based solely on Ms. Roe's HIV status and Defendants determination that she was "sexually active."

59.     MODOC's written policy IS21-1.2 authorizes "Mandated Single Cell Assignment" for "offenders who are considered an immediate or a long-term danger to other offenders that would be celled with that offender, based on extremely violent, aggressive, threatening actions toward others, which may include murder/manslaughter, sexual assault/rape, assault with serious physical injury, sexually active *HIV positive offender*." (emphasis added)

60.     Defendants' policy unconstitutionally singles out people who are living with HIV for severe disciplinary action to which others are not subjected. For example, offenders who are

engaged in consensual sexual activity with other offenders in violation of MODOC rules, but who are not HIV positive, are not automatically subjected to the single-cell mandate.

61. Defendants' policy adds an arbitrary and discriminatory category to a list of otherwise violent conduct.

62. Defendants' policy lacks any consideration of modern medicine and does not engage in an individualized assessment. The policy is arbitrary and unnecessary to protect others from HIV transmission and discriminates on its face against people living with HIV. The policy also discriminates on the basis of disability, HIV, by denying access to programs and services on the basis of HIV status.

63. Defendants also referred Ms. Roe to the local prosecutor for criminal charges in relation to the assault by her cellmate.

64. In October 2016, the local prosecutor dismissed, *nolle prosequi*, criminal charges against Ms. Roe relating to the assault by her cellmate.

65. Despite this, Defendants refused to place her back in general population, and instead kept her in solitary confinement for the next five years without a basis for the prolonged punishment.

66. Throughout the entirety of her classification and placement in solitary confinement, Ms. Roe was not sexually active, did not seek out sexual relationships with any individuals, and displayed no violent or sexual conduct.

### Ms. Roe's HIV treatment and viral suppression.

67. At all relevant times to this action, Ms. Roe received treatment from Defendants' medical service providers for her HIV. She was prescribed an anti-retroviral medication regimen consisting of darunavir, lamivudine, ritonavir and tenofovir by health services. Defendants also

had an HIV medical specialist review and monitor Ms. Roe's treatment.

68. Since the start of her incarceration, Ms. Roe's HIV has been virally suppressed. The U.S. Centers for Disease Control and Prevention ("CDC") defines viral suppression as having less than 200 copies of HIV per milliliter of blood. Per the CDC, when a person achieves viral suppression, it is virtually impossible to transmit HIV through sexual intercourse.

69. At all relevant times, Ms. Roe was well under the CDC definition for viral suppression (200 copies/ml).

***Defendants' discriminatory and unconstitutional decisions and policies subjected Ms. Roe to inhumane conditions in solitary confinement causing her physical and mental harm.***

70. For over six years, Defendants subjected Ms. Roe to conditions of confinement in solitary confinement that pushed her beyond the brink of what she could bear physically and mentally despite knowing of the severe risk of harm of this practice.

71. The conditions of confinement in solitary confinement were an atypical and significant hardship compared to the conditions that were otherwise available to those incarcerated in general population within MODOC's custody.

72. Between 2015 and 2021, Ms. Roe was transferred among a series of similarly small, stifling cells where she was confined alone for 23 hours a day for three days a week and 24 hours a day for the other four days. For over six years, she was repeatedly denied meaningful reviews of her assignment to solitary confinement.

73. Throughout the entire time period in solitary confinement, of over 2000 days, Ms. Roe was forced to spend the time in a cell that was approximately 5 feet by 10 feet.

74. The mattress provided to Ms. Roe in solitary was so thin she could feel the cold metal bunk underneath her. At times, Ms. Roe was forced to sleep on a thin mattress on the floor causing her to endure acute back pain.

75.     For over two of her six years in solitary confinement, Ms. Roe was exposed to extreme cold. Her cell was so cold that she felt as if she were outside. There was ice on the windows, she could see her breath, and she shivered constantly. Despite this, Defendants refused to provide Ms. Roe with additional blankets and even removed the makeshift "newspaper caulk" she tried to use to block the cold air. Again, this extreme cold was specific to people placed in solitary confinement and did not exist in general population.

76.     Incarcerated people from the SSRU (Secure Social Rehabilitation Unit)[3] were brought to segregation alongside Ms. Roe. These incarcerated people from SSRU often threw feces, urine, or semen out of their cell and were prone to making loud and disturbing noises and sounds.

77.     Prison guards often used chemical agents against incarcerated people from the SSRU—chemical agents that also impacted Ms. Roe and caused her respiratory discomfort (such as coughing, watering eyes, and running nose).

78.     Incarcerated people from SSRU also often flooded their cells and the wing. When this happened, Ms. Roe was left in standing water, sometimes overnight, until jail staff or other incarcerated people cleaned up the water. Ms. Roe's cell was often covered in water and mold.

79.     The noise in Ms. Roe's solitary cell was significantly greater than in general population—both during the day and at night. Ms. Roe could not sleep during the day because the lights were always on and because the sounds of other incarcerated people and prison life filtered

---

[3] According to MODOC's website, SSRU is defined as: "A mental health unit within the Jefferson City Correctional Center that provides residential mental health care of maximum security level offenders with significant mental illness who cannot adequately function in the general population due to mental illness. The unit is designed to provide the security, medication and counseling services required to maintain the optimum level of institutional and mental health adjustment possible for offenders with significant mental illness. This unit is not intended to provide hospital care. (11-5-15, IS12-3.6)," *available at* https://doc.mo.gov/glossary (last accessed 6/26/2023).

in through the walls of her small cell. Nor could she sleep at night because of screaming from other incarcerated people in the solitary confinement unit, persistent beating on doors, and because guards periodically woke her up from sleep by pointing a flashlight to the face, or by slamming the flashlight against the window in the cell door—something that happens far less often in general population. This, along with the associated sleep deprivation, caused her emotional distress.

80. For two years, Ms. Roe could not see anything outside her cell door other than a prison wall. During the few hours she was allowed outside of her cell, she was forced to wear shackles. These conditions do not exist in general population.

81. As a result of the conditions of solitary confinement, Ms. Roe suffered and was treated for rashes and scabies.

82. During that time and because of Defendants' actions and omissions, Ms. Roe's mental health rapidly deteriorated, which manifested itself in many catastrophic ways including several attempts to complete suicide.

83. As a result of her segregation Ms. Roe suffered from depression, anxiety, insomnia, feelings of hopelessness, urges to self-harm, suicidal ideation, and actual attempts to complete suicide.

***Defendants were deliberately indifferent to the torture that Ms. Roe was subjected to and the actual severe harm she experienced.***

84. At all relevant times while Ms. Roe was in solitary confinement, Defendants were well aware of and knew of the severe risk of harm caused by long-term segregation including physical pain, suffering, mental deterioration and physical harm.

85. Defendants acted with deliberate indifference to the catastrophic impact of prolonged isolation and the conditions of confinement on Ms. Roe.

86. Beyond the well-established harms associated with solitary confinement, including

severe isolation and deprivation of human contact, Ms. Roe was regularly exposed to horrific conditions of confinement which were exponentially worse than conditions in general population, including sensory overload, which inflicted extreme physical and mental pain and long-lasting damage.

87.     These inhumane conditions were specific to cells used for solitary confinement and did not exist in the general population units. Defendants did nothing to address the conditions of her cell despite her repeated requests for help.

88.     Ms. Roe was deprived of clothes that matched her gender-identity while in segregation. Officers told her that her ad-seg classification was the reason she could not access appropriate clothing. These restrictions did not exist in general population.

89.     Ms. Roe was deprived of gender affirming medical care for three years. She repeatedly disclosed she is a transgender woman and requested hormone replacement therapy, which she never received.

90.     In the general population, incarcerated people are able to make phone calls, have a cellmate, a television, access to the canteen, access to the library, have longer recreational periods, regularly speak with their family or loved ones, have work privileges, participate in a variety of programming, turn the lights in their cell off and on, and walk in the yard. Ms. Roe was denied access to all these things during the over six years in solitary confinement.

91.     The denial of access to a television or radio—items she could have ordinarily accessed in general population–was especially hard for Ms. Roe, who loves to sing. Her inability to sing and listen to music was detrimental to her sense of self.

92.     Prior to being placed in solitary confinement, Ms. Roe worked as a porter and completed programs such as anger management and ICVC (Impact of Crime on Victims). She was

denied access to productive work assignments or classes while in solitary.

93.    Moreover, incarcerated people in general population are not exposed to the kind of sensory overload torture Ms. Roe was exposed to while in solitary confinement, described above, including the near constant screaming, exposure to light, and the smells of mace and feces.

94.    The conditions of confinement that Ms. Roe was subjected to in solitary confinement made her feel empty, exhausted, helpless and as if she were going insane. She had difficulty sleeping and at one point made the decision not to eat in order to cause harm to herself.

95.    These conditions also led to Ms. Roe attempting to complete suicide on at least two occasions, which were documented by Defendants. Ms. Roe expressed suicidal ideations or attempted to complete suicide multiple times while in solitary confinement as a result of the horrific conditions of her solitary confinement. Rather than receive help from Defendants, Ms. Roe was punished and given a conduct violation for her attempt to complete suicide.

96.    In 2015, Ms. Roe attempted to die by suicide by hanging herself with a rope that she had made from cloth in her cell.

97.    Ms. Roe attempted suicide again in 2016.

98.    This conduct violation was subsequently used against Ms. Roe by the Classification Committee as a reason to keep her in segregation.

***Defendants were deliberately indifferent to Ms. Roe's suicidal ideation and multiple attempts to complete suicide.***

99.    There is such widespread consensus among the scientific community, correctional professionals, and courts about the severe harms caused by solitary confinement, and reports of its dangers have been covered so frequently by the press that Defendants could not have avoided actual knowledge of risks. The risks associated with solitary confinement were well known to Defendants in general and as to Ms. Roe specifically.

100.    Defendants were aware of her suicidal ideation and suicide attempts and, rather than helping her, they instead disciplined her for attempting to complete suicide.

101.    As a result of her solitary treatment, Ms. Roe stopped eating as an act of self-harm. She communicated this fact to Defendants including Defendant Kintner. Defendant Kintner did nothing to address Ms. Roe's suicidal ideations nor did Kintner do anything to address the steps that Ms. Roe was taking to attempt to commit suicide or to cause harm to herself.

102.    Ms. Roe also regularly communicated the fact that she was in psychological distress to Defendant Dunbar during his rounds. He ignored her complaints and did nothing to address the torturous conditions in which she was confined.

103.    Defendants were aware of the detrimental impact solitary confinement was having on Ms. Roe, including her attempts to commit suicide. They also did nothing to address the torturous conditions in which Ms. Roe was confined.

104.    The trauma associated with her depression and emotional distress, stemming from her solitary confinement, manifested itself physically. Ms. Roe was constantly tired, could not sleep, her skin broke out in rashes and her hair fell out.

105.    Upon information and belief, during her over six years in isolation at least three other incarcerated people who were detained in the same inhumane conditions as Ms. Roe died by suicide, including another incarcerated transgender woman. Defendants were acutely aware of those suicides during or immediately after they occurred and the effects these incidents had on Ms. Roe.

***Defendants violated Ms. Roe's right to due process by denying her meaningful review of her classification to solitary confinement.***

106.    Upon information and belief, JCCC's Classification Committee is tasked with reviewing the status of a person placed in administrative segregation and making recommendations

as to whether that person should continue to be detained in solitary confinement. On information and belief, this recommendation, once approved by the institution's warden, reflects the decision of the Missouri Department of Corrections.

107. Under MODOC policy, Defendants purport to provide process to incarcerated people placed in solitary confinement through classification hearings held by the Classification Committee that are to take place every 30, 60, or 90 days. After a supposed hearing, the Committee makes a recommendation as to whether someone should be retained in solitary confinement and the warden ultimately approves the Committee's decision.

108. Despite these policies and mechanisms, Defendants' review of Ms. Roe's placement in solitary confinement failed to comport with basic procedural safeguards and guarantees, depriving her of liberty and placing her at continued risk of harm.

109. Upon information and belief, throughout her over six years in solitary confinement, Defendants denied Ms. Roe regular reviews of her classification to administrative segregation.

110. Upon information and belief, on multiple occasions, Defendants failed to comply with their own policies to have a classification hearing at least every 90 days and delayed the hearings for months.

111. Defendants regularly failed to provide Ms. Roe with notice prior to the Classification Committee hearings. She often did not find out about a hearing until she was being escorted to it from her cell, although on several occasions these reviews occurred directly outside of Ms. Roe's cell door.

112. When reviews did occur, they were meaningless, sham reviews of Ms. Roe's classification status that did not comply with basic procedural safeguards. The reviews lasted less than a minute, and Defendants did not permit Ms. Roe to speak during the review.

113. Importantly, the Classification Committee lacked the authority to remove Ms. Roe from solitary confinement, and thus the "hearings," even when conducted, were meaningless. This was because, as a matter of MODOC-wide practice, only a Deputy Division Director or a department official at or above the zone director level may authorize removal of a single-cell mandate. When an offender housed at JCCC is placed on single-cell mandate, they are housed in administrative segregation; JCCC does not house any offenders on single-cell mandate in general population as a matter of policy and practice.

114. Following these sham proceedings, Classification Committee members failed to offer any basis or justifications for their decision to keep Ms. Roe's classification and to place her in segregation, aside from the fact that she was on single-cell mandate—a classification status based solely on her HIV status.

115. Defendants never conducted an individualized assessment of Ms. Roe's circumstances during these classification hearings, including any purported dangers associated with her HIV status.

116. Defendants did not consider the fact that Ms. Roe was not seeking sexual partners or acting to engage in sexual activity of any kind with others.

117. Ms. Roe did not receive any explanation for the Classification Committee's decision to keep her in solitary confinement. Instead, she was given boilerplate forms that stated her single-cell mandate was reviewed and that the Committee had determined that she remain in in solitary without further detail.

118. Despite knowing that Ms. Roe is a transgender woman, Defendants continued to use pronouns inconsistent with her gender identity in official documents and records.

119. An excerpt of a hearing decision is shown below. Defendants never explained

whether their decisions were based on Ms. Roe's current level of risk of transmission or an individualized assessment.



120.    Defendants, including Defendant Kintner, told Ms. Roe that she was being kept in solitary on account of her "status"—upon information and belief, a reference to her HIV status.

121.    Defendants Justin Krantz, Noel Obi, Jason Hess, Stanley Keely, Elizabeth Thornton, and Michael Cahalin were members of the Classification Committee and personally contributed to classification hearings, which amounted to rubber-stamping decisions to keep Ms. Roe in solitary confinement without reasoning or explanation beyond the fact that she was assigned to single-cell mandate.

122.    Defendants Krantz, Obi, Hess, Keely, Thornton, and Cahalin acted without any official justification or findings supporting their decisions. They evaded their responsibilities to afford Ms. Roe due process of law.

123.    In the rare instance that Defendants Krantz, Obi, Hess, Keely, Thornton, and Cahalin noted anything in their barebones "summary of findings" in Ms. Roe's classification review forms, they often cited older minor disciplinary infractions or old disciplinary infractions,

without explanation. These notes did not reflect an evaluation of whether Ms. Roe was an ongoing danger or a threat to other incarcerated people.

124.     Those rare instances of citations also included disciplinary infractions related to events tied to the devastating impact solitary confinement had on Ms. Roe's mental health. For example, the Classification Committee cited to her attempted suicides, including her attempts to hang herself, as justification to keep her detained in solitary confinement, without further explanation or justification as to whether her acts of self-harm created a security risk supposedly warranting segregation based on Defendants' own policies.

125.     Defendants also relied on disciplinary infractions related to Ms. Roe's attempt to access items such as clothing appropriate for her gender identity, again without explanation, when determining to keep her in solitary confinement.

126.     In any event, these disciplinary infractions had no bearing on Ms. Roe's classification: policy mandated she be held in solitary confinement due to her single-cell mandate, which the Classification Committee could not change, and which was imposed due to her HIV status.

127.     Defendants on the Classification Committee and Defendant Cassady repeatedly punished Ms. Roe without any due process both for manifestations of the trauma associated with prolonged solitary confinement and for any attempts she made to maintain her dignity, and not for valid security concerns or other penological interests.

128.     Defendant Kintner repeatedly told Ms. Roe that she was going to "rot in there" because she was HIV-positive.

129.     In sum, there was no penological purpose or justification to Ms. Roe's retention in solitary confinement under cruel and unusual conditions. While incarcerated, Ms. Roe filed

grievances about her extended isolation in solitary confinement and the conditions of confinement and exhausted the administrative remedies available to her.

130. Specifically, she filed an Informal Resolution Request, Grievance, and Grievance Appeal about her extended isolation in solitary confinement, all of which were denied.

131. Defendants through their policies and practices prevented Ms. Roe from being released into general population after being put in administrative segregation.

132. Upon information and belief, Defendants have a policy and practice of categorically placing incarcerated people living with HIV in segregation and on single-cell mandate when they are involved in a sexual assault, regardless of whether they are the perpetrator, regardless of whether they present a security risk and without conducting an individualized assessment, subjecting them to drastically severe punishment.

133. Defendant Cassady was responsible for approving placements on single-cell mandate and had the authority to override any disciplinary sanctions noted in Committee findings. Defendant Cassady recommended Ms. Roe's placement in segregation, and took no action to request a zone director or higher remove the single-cell mandate, despite being aware that there was no valid reason to keep her in solitary, and despite being aware of the harm caused to Ms. Roe by segregation and isolation.

134. As a result of the foregoing, Ms. Roe has suffered tremendous and ongoing damage including but not limited to physical harm and mental suffering, all directly and proximately caused by Defendants' actions and omissions, and due to their unconstitutional and discriminatory policies and practices.

## CLAIMS FOR RELIEF

## COUNT I – CRUEL AND UNUSUAL PUNISHMENT
**(Eighth Amendment Claim for Damages and Declaratory Relief under 42 U.S.C. § 1983)**
**(*Against all Defendants.*)**

135.    Each paragraph of this Complaint is incorporated as if fully restated here.

136.    The history and well-established effects of long-term solitary confinement in this country evidence that the practice is both "unusual" and "cruel."

137.    Solitary confinement for over six years constitutes long-term solitary confinement.

138.    Defendants' assignment of Ms. Roe to solitary confinement under torturous conditions for over six years including forcing her to remain in the cell for 23-24 hours a day, constitutes cruel and unusual punishment in violation of the Eighth Amendment.

139.    Solitary confinement is the direct and proximate cause of Ms. Roe's ongoing harm and mental health crisis that precipitated her extreme physical and mental deterioration.

140.    Each Defendant was individually aware of the well-established fact that long-term solitary confinement causes significant harm. Defendants were deliberately indifferent to the harms Ms. Roe endured in prolonged solitary confinement, despite ongoing and obvious and devastating consequences to Ms. Roe's physical and mental health.

141.    The actions of the individual Defendants were the direct and proximate cause of the violations of Ms. Roe's constitutional rights and of the damages suffered by Ms. Roe, including bodily injury, pain, suffering, suicidal ideation, emotional distress, anguish, and humiliation.

142.    The individual Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Ms. Roe's clearly established constitutional rights.

143.    Additionally, Ms. Roe seeks declaratory relief against Defendants Trevor Foley and

Doris Falkenrath in their official capacities to prevent the continued violation of her constitutional rights.

## COUNT II – DUE PROCESS
**(Fourteenth Amendment Claim for Damages and Declaratory Relief**
**under 42 U.S.C. § 1983 for failure to provide meaningful review of single-cell mandate)**
*(Against Defendants Trevor Foley in his official capacity; Doris Falkenrath in her official*
*capacity; and Jay Cassady, Justin Krantz, Noel Obi, Jason Hess, Stanley Keely, Elizabeth*
*Thornton, Michael Cahalin, Dwayne Kempker, Jason Lewis, and John Doe,*
*in their individual capacities, only.)*

144.    Each paragraph of this Complaint is incorporated as if fully restated here.

145.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

146.    Defendants have an unconstitutional practice and policy of systematically denying due process rights to all offenders held in segregation on single-cell mandate.

147.    Ms. Roe suffered substantial deprivations of liberty as set forth above as a result of her prolonged solitary confinement of over six years. The conditions Ms. Roe was forced to endure in solitary confinement—including but not limited to the sensory overload torture and the loss of her ability to interact with others and to see family—were atypical and a significant hardship relative to the ordinary conditions and incidents of life in general at JCCC and any MODOC facility.

148.    Defendants deprived Ms. Roe of her liberty without the opportunity to present any evidence or statement, including evidence on the lack of risk of HIV transmission or any other meaningful measures including a hearing, opportunity to present witnesses, or assessment by professionals who are knowledgeable of HIV transmission.

149.    Defendants, including through the deliberate acts of Defendants with final authority

regarding placement and review of single-cell mandate assignments, deprived Ms. Roe of this liberty interest without providing due process by, among other things:

a. automatically, and without individualized consideration or meaningful review, assigning Ms. Roe to single-cell mandate in administrative segregation (otherwise known as solitary confinement) for the duration of her sentence due to her HIV status;

b. implementing a policy and practice that prevented the Classification Committee from making any adjustments to offenders' single-cell mandate status, rendering any classification hearings futile and systematically denying meaningful reviews of Ms. Roe's assignment to single-cell mandate, otherwise known as solitary confinement; and

c. using solitary confinement as a pretext for indefinite confinement without evaluating or explaining any valid, continuing, and subsisting reason for segregation with reasonable specificity.

150. As a result of these failures, Ms. Roe's placement in solitary confinement was intentionally prolonged and she suffered physical and psychological injuries described in this Complaint.

151. These deprivations and resulting harms continued for over six years.

152. And as a result of enforcing a discriminatory and unconstitutional policy, Ms. Roe suffered physical and psychological injuries.

153. The actions of the individual Defendants were the direct and proximate cause of the violations of Ms. Roe's constitutional rights and of the damages suffered by Ms. Roe, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

154. The individual Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Ms. Roe's clearly established constitutional

rights.

155.     In addition to damages, Ms. Roe seeks declaratory relief against Defendants Trevor Foley and Doris Falkenrath in their official capacities to prevent the continued violation of her constitutional rights.

### COUNT III – DUE PROCESS
**(Fourteenth Amendment Claim for Damages and Declaratory Relief**
**under 42 U.S.C. § 1983 for failure to provide meaningful review of single-cell mandate for people living with HIV)**
*(Against Defendants Trevor Foley in his official capacity; Doris Falkenrath in her official capacity; and Jay Cassady, Justin Krantz, Noel Obi, Jason Hess, Stanley Keely, Elizabeth Thornton, Michael Cahalin, Dwayne Kempker, Jason Lewis, and John Doe, in their individual capacities, only.)*

156.     Each paragraph of this Complaint is incorporated as if fully restated here.

157.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

158.     Defendants have an unconstitutional practice and policy of systemically denying due process rights to all HIV-positive offenders held in segregation on single-cell mandate.

159.     Defendants Jay Cassady and Dwayne Kempker placed Ms. Roe on single-cell mandate based on her HIV status without any individualized assessment, including considering that she was on antiretroviral therapy. This decision was ratified and remained unaltered by subsequent members of the Classification Committee, including Defendants Krantz, Obi, Hess, Keely, Thornton, and Cahalin, as well as by zone directors Jason Lewis and John Doe

160.     Once on single cell mandate, Ms. Roe suffered substantial deprivations of liberty as set forth above, during her prolonged solitary confinement of over six years. The conditions Ms. Roe was forced to endure in solitary confinement—including but not limited to the sensory

overload torture and the loss of her ability to interact with others and to see family—were atypical and a significant hardship relative to the ordinary conditions and incidents of life in general at JCCC and any MODOC facility.

161. Defendants deprived Ms. Roe of her liberty without the opportunity to present any evidence or statement, including evidence on the lack of risk of HIV transmission or any other meaningful measures including a hearing, opportunity to present witnesses, or assessment by professionals who are knowledgeable of HIV transmission.

162. Defendants, including through the deliberate acts of Defendants with final authority regarding placement and review of single-cell mandate assignments, deprived Ms. Roe of this liberty interest without providing due process by, among other things:

a. failing to regularly provide periodic meaningful reviews of Ms. Roe's assignment to single-cell mandate, otherwise known as solitary confinement;

b. when infrequent reviews were held, failing to provide advanced notice of those reviews or the factual basis for her ongoing placement; failing to allow Ms. Roe a meaningful opportunity to be heard or to present evidence; failing to articulate adequate basis for Ms. Roe's ongoing placement in solitary confinement; failing to inform her of the requirements to be released from solitary confinement; and failing to conduct any individualized or meaningful consideration of Ms. Roe's HIV status;

c. using solitary confinement as a pretext for indefinite confinement without evaluating or explaining any valid, continuing, and subsisting reason for segregation with reasonable specificity, including Ms. Roe's HIV status or whether she was sexually active; and

d. as a matter of practice and policy, keeping Ms. Roe in solitary confinement indefinitely

and automatically based on her HIV status.

163.     As a result of these failures, Ms. Roe's placement in solitary confinement was intentionally prolonged and she suffered physical and psychological injuries described in this Complaint.

164.     These deprivations and resulting harms continued for over six years.

165.     And as a result of enforcing a discriminatory and unconstitutional policy, Ms. Roe suffered physical and psychological injuries.

166.     The actions of the individual Defendants were the direct and proximate cause of the violations of Ms. Roe's constitutional rights and of the damages suffered by Ms. Roe, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

167.     The individual Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Ms. Roe's clearly established constitutional rights.

168.     In addition to damages, Ms. Roe seeks declaratory relief against Defendants Trevor Foley and Doris Falkenrath in their official capacities to prevent the continued violation of her constitutional rights.

### COUNT IV - VIOLATION OF THE EQUAL PROTECTION CLAUSE
**(Fourteenth Amendment Claim for Damages, Declaratory and Injunctive Relief under 42 U.S.C. § 1983)**
*(Against Defendants Trevor Foley and Doris Falkenrath in their official capacities and Alan Earls, Stanley Keely, Dwayne Kempker, Jason Lewis, and John Doe in their individual capacities, only.)*

169.     Each paragraph of this Complaint is incorporated as if fully restated here.

170.     Defendants' policies and practices impermissibly discriminate, both on their face and as applied, against people living with HIV by categorically subjecting them to harsher penalties based on their HIV status in comparison to similarly situated people who do not have

HIV. Defendants' discriminatory treatment against Ms. Roe on account of her HIV status directly and proximately caused Ms. Roe's injuries and damages, as more fully set forth above.

171.    Government discrimination against people living with HIV bears all the indicia of a suspect classification requiring heightened scrutiny by the courts.

172.    People living with HIV have suffered through a unique history of misinformation, stigma, and discrimination for decades, and continue to suffer such discrimination to this day.

173.    People living with HIV are a discrete and insular group and lack the political power to protect their rights through the legislative process. A small minority of the overall population is currently living with HIV. People living with HIV fear disclosing their status, rarely choose to live openly with HIV, and continue to lack representation at any level of the federal government. For the first decade of the HIV epidemic, the needs of people living with and at higher risk for HIV were ignored and/or not adequately resourced by federal, state, and local governments. Even today, many people living with HIV do not have access to care, and there are aspects of the criminal law that unfairly single out and discriminate against people living with HIV.

174.    Particularly in light of dramatic medical advances including the use of antiretroviral medications, a person's HIV status bears no relation to that person's ability to contribute to society.

175.    Even with medical treatment rendering their viral load undetectable, a person cannot change their HIV status. While HIV is treatable and manageable, it is not curable. There is no available course of treatment that a person could undergo to change their status as a condition of equal treatment.

176.    Defendants' disparate treatment of Ms. Roe and other people living with HIV deprives her of equal protection of the laws causing her physical, emotional, and dignitary harms.

177.    Defendants' policy, which explicitly classifies people for disadvantage based on

their HIV status, is not adequately tailored to serve any governmental interest. Medical science extinguishes any valid purpose for such disparate treatment. Therefore, there is not even a rational relation to a legitimate government interest that justifies this disparate treatment, let alone an important or compelling one. Thus, Defendants' policy as it singles out people living with HIV cannot withstand any form of scrutiny and is invalid.

178.    Plaintiff seeks injunctive and declaratory relief against Defendants Trevor Foley and Doris Falkenrath in their official capacity to prevent the continued violation of her constitutional rights.

### COUNT V – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
#### (Claim for Damages, Declaratory and Injunctive Relief
#### under 42 U.S.C. § 12101 et seq.)
#### (Against Defendants Trevor Foley and Doris Falkenrath in their official capacities, only.)

179.    Each paragraph of this Complaint is incorporated as if fully restated here.

180.    Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 states that "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."

181.    As a person incarcerated within a MODOC facility, Ms. Roe was a "qualified individual" under Title II of the ADA.

182.    HIV is a chronic medical condition and an "impairment that substantially limits [a] major life activit[y]," 42 U.S.C. 12102(1)(A), specifically, "the operation of a major bodily function, . . .  the immune system." 42 U.S.C. 12102(2)(B). Because she is living with HIV, Ms. Roe is limited in one or more major life activities, including, absent ameliorative measures, the limitation of functioning of the immune system. Accordingly, Ms. Roe is a member of the class of

persons protected by the ADA, as amended.

183. Based on her diagnosis of HIV, Ms. Roe suffers from a disability within the meaning and scope of 42 U.S.C. § 12102, as amended, and is a member of the class of persons protected by the ADA.

184. For six years, Ms. Roe did not receive an individualized assessment in any meaningful sense of the term; the scientific evidence overwhelmingly suggests that she posed (and still poses) little to no risk to others; and any remote or theoretical risk that she may pose certainly does not rise to the level of "significant."

185. Defendants, who were ultimately responsible for her care and custody, including the provision of constitutionally-adequate medical care, had actual knowledge of her disability.

186. Defendants had knowledge of Ms. Roe's federally protected rights under the ADA and acted with deliberate indifference by denying Ms. Roe the benefits of services, programs, or activities because of her disability by placing her in solitary confinement.

187. As a direct and legal result of Defendants' actions and omissions, Ms. Roe was denied, *inter alia*, a cellmate, access to television, access to a tablet, access to the canteen, access to the library, the ability to work or participate in the work program, longer recreational periods, the ability to regularly speak with her family or loved ones, the ability to turn the lights off and on, the ability to walk in the yard, and safe and humane detention conditions.

### COUNT VI – VIOLATION OF THE REHABILITATION ACT OF 1973
### (Claim for Damages, Declaratory and Injunctive Relief
### under 29 U.S.C. § 794)
### (Against Defendants Trevor Foley and Doris Falkenrath in their official capacities, only.)

188. Each paragraph of this Complaint is incorporated as if fully restated here.

189. Defendants receive federal financial assistance through multiple avenues, including

the Medicaid program, which is jointly funded by the federal government and the state.

190.    Ms. Roe is a qualified individual with a disability that substantially limits her life activities.

191.    Defendants through their policies and practices discriminated against and caused Ms. Roe to be excluded from participation in programs, services, and activities within MODOC and JCCC solely due to her disability, in violation of Section 504 of the Rehabilitation Act.

192.    Defendants had knowledge of the federally protected rights under the Rehabilitation Act and acted with deliberate indifference by denying Ms. Roe the benefits of public services, programs, and activities because of her disability.

193.    As a direct and legal result of Defendants' actions and omissions, Ms. Roe was denied, *inter alia*, a cellmate, access to television, access to a tablet, access to the canteen, access to the library, the ability to work or participate in the work program, longer recreational periods, the ability to regularly speak with her family or loved ones, the ability to turn the lights off and on, the ability to walk in the yard, and safe and humane detention conditions.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiff Jane Roe respectfully requests judgment against Defendants, jointly and severally, for the following:

**A.** Adjudging and declaring that the policies, practices, and conduct described in this Complaint violates the Eighth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

**B.** Permanently enjoining enforcement by Defendants of MODOC Policy IS21-1.2 with respect to people living with HIV in MODOC custody;

**C.** Awarding Ms. Roe compensatory, punitive, and nominal damages;

**D.** Ordering Defendants to expunge Ms. Roe's prison records including her classification records to remove any reference to a violation of MODOC Policy IS21-1.2 and ensure that if Plaintiff is again in MODOC custody she would not face a heightened security classification as a result of the incidents underlying this case;

**E.** Awarding Ms. Roe costs, expenses, and reasonable attorneys' fees arising out of this litigation pursuant to 42 U.S.C. § 1988(b), the ADA, and the Rehabilitation Act; and

**F.** Granting such other and further relief this Court may deem just, proper, and appropriate.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury.

Dated: July 1, 2024                                      Respectfully submitted,


By: /s/ Amy E. Breihan

RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER

Amy E. Breihan (MO Bar # 65499)
Shubra Ohri (MO Bar # 74116)
906 Olive Street, Suite 420
Saint Louis, Missouri 63101
Phone: (314) 254-8540
shubra.ohri@macarthurjustice.org
amy.breihan@macarthurjustice.org

LAMBDA LEGAL DEFENSE
& EDUCATION FUND, INC.

Richard Saenz*
Jose Abrigo*
120 Wall Street, 19th Floor
New York, NY 10005

Phone: (212) 809-8585
rsaenz@lambdalegal.org
jabrigo@lambdalegal.org

Kell Olson*
3849 E Broadway Blvd, #136
Tucson, AZ 85716
213-382-7600
kolson@lambdalegal.org

SHOOK, HARDY & BACON LLP

William Walberg, MO Bar # 69554
Gregory K. Wu, MO Bar # 54087
Connor W. Smith, MO Bar # 72132
Jennifer E. Hackman, MO Bar # 68109
Zachary S. Beach, MO Bar #73620
Jacob Holland, MO Bar #75365
2555 Grand Blvd.
Kansas City, MO 64108
Phone:  816-474-6550
Fax:  816-521-5547
wwalberg@shb.com
gwu@shb.com
cwsmith@shb.com
jhackman@shb.com
zbeach@shb.com
jnholland@shb.com

*Attorneys for the Plaintiff*

*Admitted Pro Hac Vice*